# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 12, 2016 Session

## STATE OF TENNESSEE v. PRENTIS LEE

### Appeal from the Criminal Court for Shelby County
### No. 1502464 James C. Beasley, Jr., Judge
_____

### No. W2015-01538-CCA-R3-CD  -  Filed November 23, 2016
_____

The Defendant, Prentis Lee, appeals his convictions for two counts of rape and his resulting ten-year sentence. On appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress his statement to police officers; (2) the failure to preserve a record of the preliminary hearing mandated dismissal of the charges or a new preliminary hearing; (3) the evidence was insufficient to support the convictions; (4) the trial court erred in limiting defense counsel's cross-examination of various witnesses; (5) the trial court erred in admitting victim impact evidence; (6) the trial court erred in allowing the State to present rebuttal witnesses who remained in the courtroom during the trial; (7) the trial court erred in failing to instruct the jury on assault as a lesser-included offense of rape; (8) his sentence is excessive; and (9) the cumulative effect of the errors requires a new trial. Based upon our review of the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal), Katherine Oberembt and Trent Hall (at trial), Assistant Public Defenders, for the appellant, Prentis Lee.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The evidence presented at trial established that the victim, the girlfriend of the Defendant's cousin, became intoxicated at a party, fell asleep at the Defendant's home, and awoke to the Defendant raping her. The Defendant was originally indicted on one count of rape through the use of force or coercion. *See* T.C.A. § 39-13-503(a)(1). Shortly before trial, the grand jury issued a superseding indictment, charging the Defendant with one count of forcible rape, one count of rape accomplished without consent, and one count of rape of a mentally defective, mentally incapacitated, or physically helpless victim. *See* T.C.A. § 39-13-503(a)(1)-(3). On the day of the trial, both parties agreed to proceed under the superseding indictment.

### State's Proof

The victim testified that she was twenty-six years old at the time of trial and that she had been dating Mr. Larry McGowan, whose nickname was "Dump," continuously since the age of seventeen. In April 2010, the victim and Mr. McGowan stayed at the Defendant's home for a few days. On April 10, 2010, the victim and Mr. McGowan attended two parties with the Defendant. Mr. Nicholas Lee, who is the Defendant's brother, and the victim's sister also attended the parties. The victim said she did not drink alcohol often and became intoxicated at the first party after drinking two cups of beer. The victim began to vomit while at the second party, and the group decided to leave. The victim stated that upon returning to the Defendant's home, she continued to feel intoxicated and nauseated. Mr. McGowan ran a shower for her and made a pallet on the living room floor where she lay down and fell asleep. The victim was wearing a shirt with a towel wrapped around her waist and was covered with a sheet. The Defendant, Mr. McGowan, and the victim's sister were still awake. The victim did not know where Mr. Lee was.

The victim described herself as a heavy sleeper who was difficult to awaken. She testified that at some point, she awoke to a man on top of her and "pounding" her. She later clarified that the man was having sexual intercourse with her. The room was dark, and the victim was unable to see the man's face. The victim yelled Mr. McGowan's name, but the man did not respond. The victim reached out and touched the man's navel and described it as "bushy." She said Mr. McGowan did not have a "bushy" navel. She then touched the man's face and felt thick facial hair. She said neither Mr. McGowan nor Mr. Lee had hair in that area of their faces. The victim said the man continued for two or three minutes after she awoke. She stated that she was in shock and was unable to respond. The man then got up and ran out of the living room and toward the bedrooms.

The victim testified that after she cried, she got up and walked through the house to see who was awake. She entered the bedroom of the Defendant's father, who was not home at the time, and found Nicholas Lee sleeping and snoring loudly. She then knocked on the Defendant's bedroom door. The Defendant's clothes were on the floor, and the Defendant was naked in his bed. The victim told the Defendant, "You did something to me," and he denied that he had committed the acts. The victim explained that she knew that the Defendant was the man who had raped her because he was the only person in the house who was awake. Because Mr. McGowan was not around, the victim closed the bedroom door and returned to the living room where she continued to cry.

The victim cried for approximately five to ten minutes when she heard a knock at the door. The door was locked, and the lights in the house were off. The victim said she had not locked the door or turned off the lights. The victim opened the door, and a woman later identified as Ms. Tasha Banks entered the home, followed by Mr. McGowan. The victim returned to the living room to lie down, and Mr. McGowan asked her to go to Mr. Lee's bedroom since Mr. Lee was sleeping in his father's room. When the victim and Mr. McGowan entered Mr. Lee's room, the victim continued to cry, and Mr. McGowan asked her what was wrong. The victim told Mr. McGowan, "Your cousin just raped me." Mr. McGowan then knocked on the Defendant's bedroom door and told the Defendant that they needed to talk. The victim said some time passed before the Defendant came to the door. When the Defendant finally came to the door, Mr. McGowan told him that the victim had stated that he "did something to her." The victim said the Defendant became "aggressive," denied the claims, and characterized the victim as a "drama queen." The Defendant told Mr. McGowan and the victim to leave, and they refused. The victim said that while she yelled at the Defendant, he denied her claims in a "calm" and "arrogant" manner. At some point, Mr. Lee awoke, and the victim continued to argue with the Defendant for a period of time before she called the police.

Once the police arrived and spoke to the victim, she was transported to the Memphis Sexual Assault Resource Center for an examination. The victim said that a nurse took a vaginal swab and told her that the swab smelled like a condom. The victim was then transported to the police station where she gave a statement.

The victim testified that she never had a sexual relationship with the Defendant and did not consent to sexual intercourse with the Defendant on that night. She said that prior to waking up, she was unaware that anyone, including Ms. Banks, had entered or left the house. She denied initiating sexual contact with the Defendant as an act of revenge against Mr. McGowan for his infidelities. The victim denied telling anyone that she was unsure that the Defendant had raped her or that someone else had raped her.

The victim said her attitude and personality changed as a result of the incident. She stated that she did not trust anyone, could not sleep at another person's home, and did not socialize often. Because the Defendant is Mr. McGowan's cousin, she did not spend as much time with Mr. McGowan's family. She recalled occasions during which the Defendant attended a family function that she also was attending, and she became upset as a result.

On cross-examination, the victim testified that before and during the first party, she and the rest of the group shared two or three "blunts" of marijuana. She said they returned to the Defendant's home following the parties at around 2:00 or 3:00 a.m. She did not know what time she called the police. She said she was not so intoxicated that she was unable to recall what had occurred.

Upon returning to the Defendant's home following the parties, the victim called her stepfather to let him know that they were unable to drive her sister home because everyone was intoxicated. The victim then laid down on the floor. Her sister was sitting on the couch, and the Defendant and Mr. McGowan were playing chess. The victim was asleep when the Defendant drove her sister home.

The victim testified that the room was too dark to allow her to see her attacker's face. She described her attacker as having sideburns and a beard. She said that her attacker tried to put his tongue inside her mouth. She attempted to raise her head, but her attacker had his forehead on her forehead. She believed her attacker was wearing a condom.

The victim acknowledged that in June 2011, she received $2,000 from the State's victim's compensation fund. She denied that she was aware of the fund prior to April 2010 and said she first learned of the fund at the Memphis Sexual Assault Resource Center. She said that she never discussed the compensation in Mr. Lee's presence and that she never told anyone about a friend receiving $10,000 from the fund for claiming that she was raped.

The victim denied that she and Mr. McGowan had ever broken up during the course of their relationship. She also denied that she had ever suspected Mr. McGowan of being unfaithful and that she and Mr. McGowan had argued over other women. The victim denied that she was jealous that Ms. Banks and Mr. McGowan had left together to go to the store, that she propositioned the Defendant as a result, that she and the Defendant had consensual sex, and that she lied about being raped.

The victim stated that she was arrested for various domestic violence charges while the Defendant's rape charges were pending and that each of her charges were

dismissed. On May 6, 2014, the victim's domestic violence charge involving Mr. McGowan was dismissed. At the time, the victim already had been subpoenaed to testify against the Defendant six days later.

The victim testified that from December 2013 to July 2014, she and Mr. McGowan lived in an apartment next to the Defendant's father and Mr. Lee. The Defendant moved in with his father in May 2014. The victim said she saw the Defendant on one occasion during that time period.

On redirect examination, the victim testified that the prosecutor in the Defendant's case never came to court on her domestic violence charges. The charge involving Mr. McGowan was dismissed because Mr. McGowan failed to attend the hearing. The victim was one of multiple people arrested for the other two domestic violence charges. The victim stated that she did not receive any promises from the State with regard to her charges and in exchange for her testimony against the Defendant.

The victim testified that the five years during which the Defendant's charges have been pending have been difficult for her. She explained that her relationship with Mr. McGowan's family has been strained and that it would have been easier on her to decline to pursue the charges against the Defendant.

Ms. Tasha Banks testified that in April 2010, she had been dating the Defendant for approximately four months. On April 11, 2010, the Defendant called her sometime after midnight and relayed his plans to drive to her home and then take her to his house. When the Defendant asked Ms. Banks whether she had a condom, she said she would bring a bag of condoms with her. The Defendant arrived at Ms. Banks's home with Mr. McGowan. Ms. Banks said she had not met Mr. McGowan previously. They then returned to the Defendant's house.

Ms. Banks stated that upon arriving at the Defendant's home, she saw the victim sleeping on the floor. The victim was covered with a sheet. Ms. Banks said she had never seen the victim prior to that night. Ms. Banks stated that the kitchen and the living room were combined into one open room and that the victim was lying approximately three inches from the kitchen table. The Defendant and Mr. McGowan sat at the kitchen table while Ms. Banks went into the Defendant's bedroom. Ms. Banks did not know whether anyone else was in the home.

Ms. Banks testified that ten to fifteen minutes after they arrived, the Defendant told her that his stomach was hurting and asked her to go to a store to purchase cranberry juice. The Defendant instructed Ms. Banks to drive his car and to take Mr. McGowan with her. When Ms. Banks and Mr. McGowan left, the victim was still sleeping on the

floor. They drove to a convenience store located four to five minutes away. While at the store, Mr. McGowan purchased cranberry juice and Black & Mild cigars. Ms. Banks denied that Mr. McGowan propositioned her or had any physical interaction with her.

Ms. Banks stated that before they left the Defendant's house, she left the door unlocked, and the lights were on inside the house. She said that when they returned, the house was "pitch black," and the door was locked. Mr. McGowan knocked on the door "a good three minutes" before the victim opened the door. Ms. Banks said that when she walked inside, she could tell by the victim's facial expression that something was wrong.

Ms. Banks entered the Defendant's bedroom and sat on the edge of his bed. She said that the Defendant was under the sheets and that she could tell that he was naked. She snatched the sheets away from the Defendant and asked him why he was naked. The Defendant responded that he was waiting for her to arrive. Ms. Banks stated that he had not done this previously and that Ms. Banks responded, "You couldn't have been waiting on me."

Approximately five to ten minutes later, Mr. McGowan knocked on the Defendant's bedroom door and asked Ms. Banks to leave the room because he needed to talk to the Defendant. Ms. Banks stepped outside the room. The Defendant and Mr. McGowan remained inside the room with the door closed for approximately fifteen minutes. Ms. Banks said upon reentering the room, she heard Mr. McGowan ask the Defendant, "You ain't going to say what you done?" Ms. Banks asked what was happening, and the victim approached and accused the Defendant of raping her. Ms. Banks said the victim was crying. The Defendant denied the victim's claims and accused the victim of lying. Ms. Banks said during the altercation, the Defendant remained in the bed and covered with sheets. Ms. Banks told the Defendant that the matter was serious and that if he did not rape the victim, he needed to get out of the bed. At some point, the Defendant got out of bed and put on his clothes.

Ms. Banks testified that Mr. McGowan returned to the room and said that if the Defendant was not going to admit to what he had done, Mr. McGowan was going to call the police. The Defendant became upset and told everyone to leave. Ms. Banks said she was not going to walk home. At some point, Mr. Lee came out of his father's bedroom and joined the Defendant in telling everyone that they had to leave.

Ms. Banks stated that prior to going to the convenience store, she left her bag, which contained eight condoms, on the headboard of the Defendant's bed. She later noticed that one condom was missing. She did not question the Defendant about the missing condom.

Ms. Banks said both the Defendant and Mr. Lee had beards. The Defendant also had hair on his chest and in the area of his stomach and a scar around the area of his chest.

On cross-examination, Ms. Banks testified that the victim did not appear to be intoxicated when she saw her but that both the Defendant and Mr. McGowan appeared to be under the influence of alcohol. Ms. Banks did not know what time she went to the store. She said she and Mr. McGowan did not speak while she drove to the store. She did not know how long everyone argued before the police were called and acknowledged that the group could have argued for a few hours.

On redirect examination, Ms. Banks testified that when the victim told the Defendant that he had raped her, the Defendant said, "I didn't touch you. You're lying. Ashley told me about you, and they said that you w[ere] trying to set me up." Ms. Banks understood that Ashley was the Defendant's former girlfriend.

Mr. Larry McGowan testified that at the time of the trial, he and the victim had been in a relationship for ten or eleven years. He said that on April 10, 2010, he, the victim, the victim's sister, the Defendant, and Mr. Lee attended two parties. Mr. McGowan said that while the group drank alcohol, he denied that they smoked marijuana. Everyone in the group, including the victim, became intoxicated. The victim vomited and was unable to stay awake. They returned to the Defendant's home sometime after midnight. Mr. McGowan assisted the victim in taking a shower and placed sheets on the living room floor where the victim laid down and fell asleep. Mr. Lee laid down in his father's bedroom.

Mr. McGowan stated that while the victim was sleeping, he and the Defendant drove the victim's sister home, went to Ms. Banks's home, and drove Ms. Banks to the Defendant's home. Mr. McGowan said they were gone for forty-five minutes to one hour. Upon returning, the victim was still sleeping on the living room floor. Mr. McGowan said he and the Defendant played chess for a few hours at the kitchen table, and he believed that Ms. Banks sat at the table with them.

Mr. McGowan testified that the Defendant began complaining that his stomach was hurting, so Mr. McGowan and Ms. Banks went to a convenience store where Mr. McGowan purchased cranberry juice for the Defendant and cigars. Mr. McGowan stated that Ms. Banks drove the Defendant's car because she was not intoxicated. According to Mr. McGowan, they were gone for approximately ten minutes.

Mr. McGowan said that when he and Ms. Banks left the Defendant's house, the lights were on in the kitchen. He did not have a key to the house, so he left the door

unlocked. When they returned, the house was dark, and the door was locked. Mr. McGowan knocked on the door, and the victim opened it. He said that the victim was crying and that when he asked her what was wrong, she said, "Your cousin's about to go to jail." The victim told Mr. McGowan that when she woke up, a man was "in" her.

Mr. McGowan went to the Defendant's bedroom and asked Ms. Banks to step outside of the room so that he and the Defendant could talk. The Defendant denied the victim's claims. The Defendant was lying in his bed and covered with sheets. As a result, Mr. McGowan was unsure whether the Defendant was wearing clothes. Mr. McGowan remained in the bedroom for approximately ten minutes and asked the Defendant several times to get out of bed and talk to him about the claims. The Defendant eventually got out of bed but never admitted having contact with the victim. The victim and the Defendant argued, and Mr. Lee woke up as a result. Mr. McGowan said approximately fifteen minutes passed from the time that he returned from the store until the police were called.

Mr. McGowan testified that at the time, he did not have hair on his face or his navel. He believed that the Defendant had facial hair but that Mr. Lee did not.

Mr. McGowan denied that he and Ms. Banks had any physical interaction. He said he and the victim stopped associating with the Defendant after the incident. Mr. McGowan also said that whenever he and the victim saw the Defendant, the victim became upset, and Mr. McGowan would have to escort her from the location.

On cross-examination, Mr. McGowan testified that at the time of the incident, he and the victim had been together "on and off" for five years. He said they had gone through rough patches and had broken up a few times.

Mr. McGowan said the Defendant had gotten shot the prior year and was still recovering. Mr. McGowan believed that the Defendant had a scar that came up from below his waist and was unsure whether the Defendant was still wearing a bandage at that time. The Defendant told him that either green tea or cranberry juice help soothe the pain from the wound. Mr. McGowan said he and the Defendant were sitting at the kitchen table during their discussion about going to the store and that the victim was sleeping approximately ten feet or more away.

Mr. McGowan stated that both he and Ms. Banks were necessary for the trip because he did not have a driver's license but planned to make the purchases. During the drive to the store, Mr. McGowan and Ms. Banks talked about the parties that Mr. McGowan had attended earlier and listened to the radio. He said they went to the store around 3:00 or 4:00 a.m.

Mr. McGowan said he initially did not know whom to believe and wanted to get both sides of the story. He stated that while the Defendant was in his bed and under sheets when Mr. McGowan entered the bedroom, the Defendant appeared to be wearing a T-shirt. Mr. McGowan said the victim called the police.

Mr. McGowan testified that he had seen the Defendant at family events following the incident and attempted to talk to him. They played chess together approximately one month after the incident. Mr. McGowan said that he and the victim lived next door to the Defendant's father and Mr. Lee from late December 2013 to August 2014 and that he was aware that the Defendant lived with his father at some point. Mr. McGowan stated that the Defendant came to his apartment and played video games with him once or twice. At that time, the victim was living with Mr. McGowan.

On redirect examination, Mr. McGowan testified that the victim was not present when he and the Defendant played video games together. Mr. McGowan said the victim hated that he associated with the Defendant.

Mr. McGowan said that when the victim opened the door after he and Ms. Banks returned from the store, the victim told him that she woke up to the Defendant having sex with her. She said that after she rubbed the perpetrator's face and felt his mustache, she believed that the perpetrator was the Defendant. She also said that when she realized that the man who was having sex with her was not Mr. McGowan, she "kind of woke up" and saw the Defendant run to the back of the house.

On re-cross examination, Mr. McGowan testified that he told police officers that he believed the victim because she did not like to be involved in situations with the police. He acknowledged that the victim called the police in February 2009 after they were involved in an altercation. He said he became physical with the victim but denied that he hit the victim's face.

Ms. Tammy Keough, a nurse practitioner with the Memphis Sexual Assault Resource Center, was admitted by the trial court as an expert in forensic nursing. Ms. Keough examined the victim on April 11, 2010. According to Ms. Keough's medical chart, the assault occurred around 4:00 a.m. Ms. Keough said that while the victim was cooperative, she was also tense and crying. The victim reported a vaginal assault and said she thought the perpetrator may have been wearing a condom. The victim also reported that she had been kissed inside of her mouth. Ms. Keough took swabs of the victim's mouth and vaginal area. She later took a penile swab from the Defendant.

Ms. Keough said the victim did not have any traumatic injuries. Ms. Keough explained that it was rare to find vaginal injuries in women who are of child bearing age.

-9-

She stated that the results of the victim's examination were consistent with her account of the events.

On cross-examination, Ms. Keough testified that the victim's examination was consistent with "someone who has had vaginal penetration or sex with any person," including consensual sex. Ms. Keough said she did not routinely smell for condom use.

Ms. Keough stated that the victim told her that she "wasn't that drunk" and that she knew what had occurred. According to Ms. Keough's report, the victim stated:

> I tried to raise up but his head was on my forehead, and he was kissing me in my mouth. It didn't feel right. I kept saying, "Dump, Dump." He didn't say anything. I went to feel his face and there was hair. Dump don't have no hair on his face. Then I felt his navel, and there was hair. I started screaming for my boyfriend, then he started doing it real fast. Then he stopped and got up and ran in the other room. Then I heard someone knocking on the door. I answered it and I was crying. I told my boyfriend what happened.

The parties later stipulated that an examination of the vaginal swabs and the victim's underwear did not reveal the presence of semen or saliva. The parties also stipulated that the testing of the Defendant's penile swabs only revealed a partial profile of the Defendant's DNA.

Officers Lee Walker and Andrew Podesta of the Memphis Police Department received a call to go to the Defendant's home at around 6:23 a.m. on April 11, 2010. Officer Walker testified that when they arrived at the home, they met the victim, who was crying. Officer Walker believed that the victim had consumed alcohol because she was not certain what was occurring. He said the victim was "adamant" that something had happened to her and informed the officers of what had occurred. The officers also questioned others present at the scene. The Defendant denied the accusations and maintained that he had been sleeping in his bed. Officer Walker said the Defendant was the only man in the home who had facial hair.

Officer Walker stated that after obtaining consent from Mr. Lee, he and Officer Podesta searched the residence. They found an open condom wrapper in the headboard of a bed in one of the bedrooms.

On cross-examination, Officer Walker testified that the victim reported that she had consumed alcohol and fell asleep on the floor. The victim stated that she awoke when she felt someone having sex with her. She told the officer that the room was dark

and that she was unable to determine the identity of her attacker. Officer Walker said the victim did not tell him that the Defendant raped her. During the course of the investigation, Officer Walker learned that the perpetrator had hair on his face and chest. Officer Walker said that the Defendant and Mr. Lee were suspects and that they both maintained that they were asleep at the time. The arrest ticket stated that the attack occurred between 2:00 and 4:00 a.m., which Officer Walker said was based upon information supplied from the victim.

On redirect examination, Officer Walker testified that the victim said that while she did not see the perpetrator's face, she could feel things on him and recognized what she was feeling. Officer Walker said that the victim was sure about feeling hair and that her boyfriend did not have facial hair.

Lieutenant Celia Tisby of the Memphis Police Department testified that in April 2010, she was a sergeant in the Sex Crimes Division and was the lead investigator in the case. She went to the scene where she spoke to the victim. Lieutenant Tisby said that the victim appeared to be upset and that the victim's demeanor was similar to rape victims in other cases in which Lieutenant Tisby had investigated. The victim told Lieutenant Tisby what had occurred.

Lieutenant Tisby and Major Chorcie Jones interviewed the Defendant at the division's office. Lieutenant Tisby testified that prior to the interview, the Defendant signed a waiver of rights form and agreed to speak with the officers. The waiver of rights form, however, was missing from the file. Lieutenant Tisby did not know whether the file was misplaced during the investigation or after the file was given to the prosecutors.

The Defendant's statement began at 1:55 p.m. and concluded at 2:40 p.m. Lieutenant Tisby typed the questions asked and the Defendant's answers. She said that the Defendant was given the opportunity to review and sign his statement but that he chose not to sign it. She explained that throughout the interview, the Defendant asked whether he would be charged. She stated that after the interview concluded, the Defendant learned that he was still going to be charged and refused to sign his statement.

The Defendant told the officers that he, Mr. Lee, Mr. McGowan, the victim, and the victim's sister attended a party where they were drinking alcohol. The Defendant believed that the victim was drinking beer and vodka and said she vomited. They returned to the Defendant's home around 2:00 or 3:00 a.m.

The Defendant stated that while he and Mr. McGowan were sitting at a table playing chess, he asked Mr. McGowan and Ms. Banks to go to a store and purchase a Black & Mild cigar. The Defendant said that while he and Mr. McGowan were discussing a trip to the store, Mr. McGowan asked whether Ms. Banks would go too. The

Defendant explained that he sent Ms. Banks to the store with Mr. McGowan because Mr. McGowan "was trying to mess" with Ms. Banks and did not want to do so at the Defendant's home with the victim present. The Defendant said he and Mr. McGowan occasionally shared women.

The Defendant told the officers that after Mr. McGowan and Ms. Banks left, the victim woke up and said, "[Y]'all think y'all slick, who is that girl?" The Defendant said he told the victim who Ms. Banks was but that the victim did not believe him. According to the Defendant, the victim said, "He [is] going [to] quit playing with me. I'm going to show him." The Defendant said that the victim rolled over, that her sheet came off of her, and that the victim was naked. He stated that the victim asked him, "[D]o you want some of this?" The Defendant went to his bedroom and retrieved a condom from Ms. Banks's bag. He said that when he returned to the living room, he asked the victim whether she was "playing" and that she said no. He stated they then had sexual intercourse. He also stated that when the victim began calling Mr. McGowan's name, he believed that Mr. McGowan was returning, so the Defendant went back into his bedroom. After Mr. McGowan and Ms. Banks returned two or three minutes later, Mr. McGowan knocked on the Defendant's door and asked him what had occurred between him and the victim. The Defendant denied that anything had occurred, and the victim began crying and said that the Defendant did something to her. The Defendant stated that he told the victim and Mr. McGowan to call the police and tried to make them leave.

The Defendant stated that he did not know why the victim accused him of raping her. He said the victim was likely angry because he had helped Mr. McGowan "get other girls." The Defendant explained that he denied to Mr. McGowan that he and the victim had any sexual contact because he did not want Mr. McGowan and the victim to argue. The Defendant said he flushed the condom and the wrapper down the toilet. Lieutenant Tisby described the Defendant as "[k]ind of a little arrogant, kind of like self-assured, cocky like."

Major Chorcie Jones testified that in April 2010, he was assigned to the Sex Crimes Unit of the Memphis Police Department and was present when the Defendant gave a statement. He said that the Defendant was presented with a waiver of rights form and that he was positive that the Defendant reviewed the form. Major Jones stated that the presentation of the form was standard procedure and that he has never taken a statement from a suspect without the suspect first signing the form. Major Jones explained, "You're getting ready to potentially take somebody's freedom away. I would want to get that right." He maintained that the Defendant was advised of his rights, indicated that he understood his rights, said he wished to waive his rights and speak to the officers, and signed the waiver form. Major Jones later learned that the waiver form was missing.

-12-

W.D. Merritt, an investigator with the Shelby County District Attorney's Office, testified that he searched the entire file for the missing waiver form but was unable to locate it.

Ms. Shelly Vincent, a victim/witness coordinator for the Shelby County District Attorney General's Office, testified that she assists in processing claims for the Criminal Injury Compensation Fund after a victim submits a form to the claims administration in Nashville. Ms. Vincent explained that the fund provides compensation to innocent victims of crimes. To qualify for compensation, the victim must have reported the crime to the police within forty-eight hours and must fully cooperate in the investigation and prosecution of the crime. Victims of sex abuse crimes must have undergone a forensic examination at the Memphis Sexual Assault Center. A victim of rape may obtain up to $3,000 for pain and suffering and reimbursement for any medical bills paid.

Ms. Vincent said a victim may receive information about the fund from the police, a medical facility where the victim received treatment, or the Memphis Sexual Assault Center. If the perpetrator is arrested and sufficient evidence to prosecute the case exists, the District Attorney General's Office sends a brochure to the victim detailing the Criminal Injury Compensation Fund and how to apply for compensation.

The Memphis Sexual Assault Resource Center submitted a request for reimbursement for the expenses related to the victim's forensic examination. On June 29, 2011, the center was paid $750.00. The victim submitted an application for funds, which was signed and notarized on February 28, 2011. The victim was paid $2,000 from the fund on March 2, 2011.

On cross-examination, Ms. Vincent testified that the victim would not have received funds had she not cooperated in the Defendant's prosecution. Ms. Vincent later stated that the victim could have decided not to pursue the charges against the Defendant after she had received the funds.

**Defense Proof**

Mr. Nicholas Lee, the Defendant's brother, testified that on April 11, 2010, he was living with his father and the Defendant. Mr. Lee said he saw Mr. McGowan with other women on a few occasions. Mr. Lee stated that in 2010, Mr. McGowan was dating Ashley Campbell and that she later began dating the Defendant. According to Mr. Lee, Ms. Campbell was living with the Defendant in April 2010, but the Defendant drove her to her mother's home on April 10 because he did not want Ms. Campbell to be around those attending the party with him.

Mr. Lee testified that everyone was drinking alcohol while at the party and that he could not recall whether the victim was smoking marijuana. They returned from the second party at around 3:00 a.m. Mr. Lee said he went to his father's bedroom where he fell asleep. He also said that while he was not intoxicated at that time, he was likely "high." Mr. Lee stated that before he went to bed, he saw the victim speaking to her sister. He denied that the victim was intoxicated and said she was "talking normal."

Mr. Lee stated that he awoke around 4:00 or 5:00 a.m. and got up to use the restroom. He maintained that he did not hear anyone talking or walking around the house at that time. He awoke the second time when Mr. McGowan came to his room and requested a lighter. Mr. Lee said he never heard the victim scream at any point.

Mr. Lee testified that when he came out of his father's bedroom, he saw the Defendant and Mr. McGowan talking and that they were not arguing. At some point, Mr. Lee learned that something had occurred. The police were called approximately one hour after Mr. Lee awoke. Officers placed Mr. Lee and the Defendant in handcuffs and transported them to the police station. Mr. Lee understood that he was a suspect in the victim's rape. He stated that three or four days prior to the incident, he heard the victim state that a friend received $10,000 from the victim's compensation fund after she claimed that she was raped.

Mr. Lee recalled a time period following the incident during which he and his father lived in an apartment next door to Mr. McGowan and the victim. The Defendant also lived with Mr. Lee and his father for some time. Mr. Lee said he saw Mr. McGowan daily and that they visited each other's apartments. Mr. Lee stated that the victim also came to his apartment while the Defendant was living there. Mr. Lee recalled that the victim never stayed long, did not act upset or scared, and did not speak to the Defendant.

On cross-examination, Mr. Lee acknowledged that he never informed police officers of the victim's statements about her friend receiving victim compensation. Mr. Lee maintained he did not do so because the officers never asked him about the statements. Mr. Lee later stated that he did not recall whether he informed officers of the victim's statements. He said the victim told him, the Defendant, Mr. McGowan, and Ms. Campbell that a friend received $10,000 after she falsely accused someone of rape. Mr. Lee also said he informed the State's investigator of the victim's statements the day before he testified at trial and that he attempted to relay the victim's statements to a prosecutor sometime earlier.

Mr. Lee testified that he had been subpoenaed each time that the Defendant's case had been set for trial. He explained that he did not come to court on one occasion because the prosecutor told him that he did not need to do so. Mr. Lee denied telling the

-14-

State's investigator that he did not attend the proceedings because his father told him that he was not required to do so. The Defendant later told Mr. Lee that a warrant had been sworn out on him because he failed to come to court, but Mr. Lee did not go to court to resolve the matter. Mr. Lee acknowledged that he attended the trial the previous day after he was subpoenaed by the defense. He then spoke to the State's investigator for the first time in more than one year.

## State's Rebuttal Proof

The State recalled Mr. Merritt, who testified that he was asked to locate Mr. Lee, serve him with subpoenas for the court appearances, and attempt to interview him. Mr. Merritt spoke to Mr. Lee on two occasions prior to trial, once in person and once over the telephone. Mr. Merritt said that it was not until the afternoon before Mr. Lee testified at trial that Mr. Lee informed him that the victim made statements regarding victim compensation prior to the incident and that Mr. Lee had gotten up in the middle of the night of the incident and did not see or hear anything. Mr. Merritt stated that he was present when the prosecutor met with Mr. Lee and that Mr. Lee never mentioned that the victim had made statements regarding victim compensation prior to the incident.

Mr. Merritt testified that he served Mr. Lee with a subpoena last year but that Mr. Lee failed to appear in court. As a result, an arrest warrant was issued, and unsuccessful attempts were made to secure Mr. Lee's appearance. Mr. Merritt was unable to serve Mr. Lee with a subpoena for the trial.

The State recalled Lieutenant Tisby, who testified that she interviewed Mr. Lee on April 11, 2010. Lieutenant Tisby said Mr. Lee was very cooperative and appeared to have little knowledge of the events. When the officers asked Mr. Lee whether anyone was intoxicated, Mr. Lee said the victim was intoxicated and that she vomited while at the second party. Lieutenant Tisby stated that Mr. Lee never told the officers that the victim may have falsely reported the rape or that he had heard her make comments about knowing someone who had falsely reported a rape and received a large sum of money.

Lieutenant Clyde Jefferson, testified that in 2010, he was a sergeant with the Sex Crimes Bureau of the Memphis Police Department and assisted in interviewing Mr. Lee. Lieutenant Jefferson described Mr. Lee as "nonchalant" and said he believed that Mr. Lee wanted to assist the Defendant. Lieutenant Jefferson said that while Mr. Lee did not specifically state that the victim was intoxicated, Mr. Lee said the victim vomited and gave Lieutenant Jefferson the impression that she was intoxicated. Mr. Lee never told Lieutenant Jefferson that the victim may have falsely reported the rape in order to receive compensation because she had a friend who did the same thing.

The State recalled Mr. McGowan, who testified that prior to the victim's rape, he never heard the victim state that a friend had received compensation after falsely accusing someone of rape. On cross-examination, Mr. McGowan stated that he was unaware that the victim had received $2,000 from the victim's compensation fund.

The State recalled the victim, who denied telling Mr. McGowan, the Defendant, and Mr. Lee that she had a friend who falsely claimed rape and received compensation as a result. The victim said she first learned of the victim's compensation fund following the rape.

On cross-examination, the victim testified that she remained in the courtroom for the majority of the trial and heard the testimony of Mr. Lee and other witnesses. She denied that she discussed the trial with Mr. McGowan.

At the conclusion of the trial, the jury acquitted the Defendant of the charge of rape by force or coercion and convicted the Defendant of rape accomplished without consent and rape of a mentally defective, mentally incapacitated, or physically helpless victim. The trial court merged the two convictions. Following a sentencing hearing, the trial court sentenced the Defendant as a standard offender to ten years in confinement at 100 percent. This appeal followed.

## ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress his statement to police officers; (2) the failure to preserve a record of the preliminary hearing mandated dismissal of the charges or a new preliminary hearing; (3) the evidence was insufficient to support the convictions; (4) the trial court erred in limiting defense counsel's cross-examination of various witnesses; (5) the trial court erred in admitting victim impact evidence; (6) the trial court erred in allowing the State to present rebuttal witnesses who remained in the courtroom during the trial; (7) the trial court erred in failing to instruct the jury on assault as a lesser-included offense of rape; (8) the Defendant's sentence is excessive; and (9) the cumulative effect of the errors requires a new trial.

### I. SUPPRESSION OF STATEMENT

The Defendant maintains that the trial court erred in denying his motion to suppress his statement to the police. Specifically, he asserts that the evidence establishes that he was not advised of his rights and did not voluntarily waive his rights. The State responds that the evidence established that the Defendant was advised of his rights and voluntarily waived his rights and agreed to give a statement. We agree with the State.

A trial court's factual findings made during a motion to suppress are binding on an appellate court unless the evidence preponderates against them. *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). Determinations of witness credibility and the resolution of conflicts in the evidence are left to the trial court. *State v. Riels*, 216 S.W.3d 737, 753 (Tenn. 2007). An appellate court may consider testimony presented at trial in reviewing the trial court's conclusions in a motion to suppress evidence. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and to all reasonable inferences drawn from the evidence. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). A trial court's conclusions of law are reviewed de novo. *State v. Sawyer*, 156 S.W.3d 531, 533 (Tenn. 2005). Likewise, a trial court's application of law to the facts is reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

## A. Suppression Hearing

Prior to trial, the Defendant filed a motion to suppress his statement to the police, alleging that his statement was not freely and voluntarily given. During the suppression hearing, defense counsel clarified that the Defendant was seeking to suppress his statement on the basis that he was not advised of his rights and did not waive his rights prior to making the statement.

During the suppression hearing, Lieutenant Tisby testified that she and Major Jones interviewed the Defendant in the office of the Sex Crimes Division on April 11, 2010. The interview took place in a small "secretary's room" with a desk, a stool, and a few chairs.

Lieutenant Tisby said she advised the Defendant of his rights but did not recall whether she read the waiver of rights form to the Defendant. She stated that the Defendant indicated that he understood his rights and signed the waiver form. She also stated that the Defendant did not have any questions about his rights, did not request counsel, and did not stop the questioning at any point. Lieutenant Tisby said that the waiver form signed by the Defendant was missing from the file and that she was unable to locate it. She maintained that in her twenty-four years with the Memphis Police Department, she had never taken a statement from a suspect without advising him of his rights and providing him with the waiver form.

Lieutenant Tisby testified that after the Defendant signed the waiver form, she proceeded to take a typewritten statement from him. The questions and answers were typed as they were being stated. Lieutenant Tisby said the Defendant never indicated that he wished to end the interview. After the statement was completed, the Defendant reviewed the statement but refused to sign it. The Defendant said he was going to be arrested regardless.

On cross-examination, Lieutenant Tisby testified that the Defendant was under arrest when he was questioned. The Defendant signed a release agreeing to submit a DNA sample at 1:10 p.m., and his statement was taken at 1:55 p.m. Lieutenant Tisby said the waiver of rights form pertaining to a DNA sample was not the same as the waiver of rights form pertaining to a statement. She denied that she forgot to provide the Defendant with the rights waiver form for his statement after he had signed the waiver form agreeing to submit to a DNA sample.

Lieutenant Tisby testified that the Defendant was handcuffed during the interview and was not free to leave at any time. The Defendant asked whether he was being "charged," and Lieutenant Tisby told him that he was not. She explained that prior to making the statement, the Defendant was under arrest but was not yet charged. She said that during the interview, the Defendant knew that he was under arrest but specifically asked whether he was going to be "charged." Lieutenant Tisby said that after the interview concluded, the Defendant asked whether he was under "arrest," and she told him that he was. The Defendant then refused to sign the statement. Lieutenant Tisby was unsure whether she conferred with a prosecutor prior to asking the Defendant to sign his statement. She stated that the Defendant never requested counsel.

Major Jones testified that he assisted Lieutenant Tisby during the Defendant's interview. Major Jones said either he or Lieutenant Tisby would have advised the Defendant of his rights before questioning him. Major Jones also said that one of the officers would have read the waiver form aloud to the Defendant, that the Defendant would have been given an opportunity to read the waiver form, and that the Defendant would have signed the form. Major Jones stated that he was present when these events occurred and that to his knowledge, the Defendant did not ask any questions about his rights. Major Jones also stated the Defendant indicated that he understood his rights and never requested counsel. Major Jones testified that in his twenty-two and one-half years with the Memphis Police Department, he had never taken a statement from a suspect without first advising the suspect of his rights and obtaining a waiver of those rights. He said that had the Defendant requested counsel and stated that he did not wish to speak to the officers, the officers would have concluded the interview. Major Jones did not recall why the Defendant refused to sign his statement.

On cross-examination, Major Jones testified that he could not recall whether he was present when the Defendant signed the form agreeing to provide a DNA sample and when the sample was taken. Major Jones acknowledged that his testimony was not based upon personal recollection but upon what steps were required based upon his training. On redirect examination, Major Jones testified that whenever he was present for an interview of a suspect, he ensured that he also was present when the suspect was advised

-18-

of his rights because Major Jones would likely be required to sign the waiver form as a witness.

The Defendant testified that while he was initially placed in handcuffs, he was no longer handcuffed when he was questioned by the officers. He said he asked the officers whether he was under arrest, and they stated that he was not. He stated that he asked the officers whether he needed an attorney and that they told him that they just wanted to ask him some questions and obtain a DNA sample. The Defendant acknowledged that he signed a form agreeing to provide a DNA sample.

The Defendant testified that once the officers began questioning him, he asked them again whether he was under arrest and stated that if so, he wanted an attorney. He stated that the officers told him, "[N]o, we just want to ask you some questions." The Defendant maintained that when he gave the statement, he did not know that he was under arrest and that the officers planned to use the statement against him. He said he believed that the officers were going to allow him to leave after the interview was completed. He maintained that he would not have given the statement if he had been advised of his rights and told that he was under arrest before the questioning began.

The Defendant testified that when Lieutenant Tisby gave him the statement to sign, the Defendant asked whether he was going to jail, and Lieutenant Tisby confirmed that he was going to jail. The Defendant then refused to sign the statement, and Lieutenant Tisby informed him that he was under arrest.

On cross-examination, the Defendant acknowledged that he had prior felony convictions but later stated that he had never given a statement to the police with regard to the prior convictions. He testified that he did not have the opportunity to review his statement. He said that when Lieutenant Tisby told him that he was going to jail, he refused to sign the statement and requested counsel.

The State recalled Major Jones who stated that to his knowledge, the Defendant did not request counsel prior to the interview. Major Jones said neither he nor Lieutenant Tisby told the Defendant that he did not need an attorney. Major Jones stated that had the Defendant requested counsel, the officers would have ended the interview. On cross-examination, Major Jones acknowledged that his testimony was based upon his review of the supplemental police report and that he did not have any personal recollection of the interview.

At the conclusion of the hearing, the trial court denied the Defendant's motion to suppress. The trial court credited the officers' testimony and found that the Defendant was advised of his rights and that he agreed to talk to the officers. The court noted that

-19-

although no one can explain what happened to the rights waiver form, both officers were "very, very adamant about the fact that they have never nor would they ever take a … statement without giving … an advice of rights and if the witness ever asked for a lawyer or said I don't want to talk, they would not proceed." The trial court also found that the Defendant gave his statement "freely and voluntarily without threats or coercion in any form or fashion."

## B. Waiver of *Miranda* Rights

Both the United States and Tennessee Constitutions recognize a privilege against compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the United States Supreme Court set forth procedure safeguards to secure the Fifth Amendment privilege against self-incrimination. Prior to a custodial interrogation, law enforcement officers must warn the accused that

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479. After a person has been advised of these warnings, he or she may "knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.*; *see Edwards v. Arizona*, 451 U.S. 477, 484 (1981). "'[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial,' statements given during custodial interrogation are not admissible in the prosecution's case-in-chief." *State v. Freeland*, 451 S.W.3d 791, 814 (Tenn. 2014) (quoting *Miranda*, 384 U.S. at 479).

The State has the burden of proving by a preponderance of the evidence that the Defendant waived his rights under *Miranda*. *Freeland*, 451 S.W.3d at 814; *State v. Climer*, 400 S.W.3d 537, 564 (Tenn. 2013). The State's burden is satisfied if,

> based on the totality of the circumstances surrounding the interrogation, it shows that the waiver was voluntary in that "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was knowing in that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Freeland*, 451 S.W.3d at 814 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

-20-

While the Defendant testified at the suppression hearing that prior to giving the statement, he was unaware that he was under arrest and was not advised of his rights, the trial court did not credit the Defendant's testimony. Rather, the trial court credited the officers' testimony that the Defendant was advised of his rights, waived his rights, and agreed to make a statement. Determinations of witness credibility and the resolution of conflicts in the evidence are left to the trial court. *Riels*, 216 S.W.3d at 753. Although the State was unable to produce the Defendant's signed written waiver during both the trial and the suppression hearing, this court has recognized that an explicit waiver may be written or oral. *State v. Steven James McCain*, No. M2000-02989-CCA-R3-CD, 2002 WL 1033249, at *6 (Tenn. Crim. App. May 22, 2002). The trial court found that the Defendant waived his rights and agreed to make a statement after the officers informed him of his rights, and the evidence does not preponderate against the trial court's findings.

## C. Voluntary Statement

The Defendant also argues that his statement was involuntary. *See Dickerson v. United States*, 530 U.S. 428, 432-33 (2000) (noting that the test for determining the voluntariness of a statement is distinct from the issue of a defendant's waiver of his *Miranda* rights). To determine the voluntariness of a statement or a confession, "the essential inquiry … is whether a suspect's will was overborne so as to render the confession a product of coercion." *Climer*, 400 S.W.3d at 568; *see also State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) ("The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment.").

Courts must examine the totality of the circumstances surrounding the statement or a confession, including "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434). The relevant circumstances are:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep [,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

-21-

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)). No single factor, however, is necessarily determinative. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000).

The Defendant did not specifically address these factors in his appellate brief and presented no evidence at the suppression hearing to support his claim that his statement was involuntarily given. The evidence presented at the suppression hearing and at trial established that the Defendant was approximately thirty years old at the time of the statement and had an eleventh grade education. The Defendant was familiar with the legal system through his prior felony convictions. The interview was not prolonged, lasting less than one hour.

The Defendant asserts that the interrogation was "incognito" in that he was "seated in a small room with a desk, a little stool for him to sit on, and a couple of chairs, with only the interrogating officers present." He also asserts that he was misled about whether he was in custody or was going to be charged and that he would not have given the statement had he known that he would be charged anyway. While Lieutenant Tisby acknowledged that she told the Defendant that he was not being charged, she also testified that the Defendant had been placed under arrest and in handcuffs prior to the interview. The Defendant was then advised of his *Miranda* rights, including the fact that anything he said could be used against him in court. He voluntarily waived his rights and agreed to make a statement. No evidence was presented establishing that the officers promised or threatened the Defendant or otherwise engaged in any coercive police activity during the interview in an effort to obtain a statement. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (stating that "coercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"); *Freeland*, 451 S.W.2d at 817. The evidence does not preponderate against the trial court's finding that the Defendant's statement was voluntary. Therefore, the Defendant failed to establish that the trial court erred by denying his motion to suppress his statement to the police.

## II. RECORD OF THE PRELIMINARY HEARING

The Defendant asserts that because the record of his preliminary hearing was not preserved, the trial court erred in failing to either dismiss the case or order a new preliminary hearing. The State responds that the Defendant is not entitled to relief because he failed to file a motion for a new preliminary hearing within sixty days of his arraignment in accordance with Rule 5.1(a)(3) of the Tennessee Rules of Criminal Procedure. We agree with the State.

The record reflects that the Defendant was originally indicted on the charge of rape accomplished by force or coercion on March 8, 2011, and was arraigned on the charge on August 1, 2011. The Defendant filed a motion requesting that the trial court either dismiss the indictment or order a new preliminary hearing on March 26, 2015. During the hearing on the Defendant's motion, the parties agreed that following the preliminary hearing, the general sessions court dismissed the case, and the Defendant had the charge expunged from his record. The State later obtained an indictment from the grand jury charging the Defendant with rape by force. Following a hearing, the trial court denied the Defendant's motion.

Rule 5.1(a)(3) of the Tennessee Rules of Criminal Procedure addresses a defendant's right to access to the record of the preliminary hearing and provides in pertinent part:

> The evidence of the witnesses does not have to be reduced to writing by the magistrate, or under the magistrate's direction, and signed by the respective witnesses; but the proceedings shall be preserved by electronic recording or its equivalent. If the defendant is subsequently indicted, such recording shall be made available to the defendant or defense counsel so they may listen to the recording in order to be apprised of the evidence introduced in the preliminary examination. Where the recording is no longer available or is substantially inaudible, the trial court shall order a new preliminary hearing upon motion of the defendant filed not more than 60 days following arraignment. The indictment shall not be dismissed while the preliminary hearing is pending….

Even when the general sessions court dismisses a case following a preliminary hearing, a defendant is entitled to the recording of the preliminary hearing in the event the defendant is later prosecuted for the same offense through indictment or presentment. Tenn. R. Crim. P. 5.1(c). "The remedy for the failure to preserve the recording in this circumstance shall be as set forth in subsection (a)(3)." *Id.*

"[A] defendant's remedy for a lost or damaged recording is merely another preliminary hearing and not … dismissal of [the] indictment." *State v. Angela K. Pendergrass*, No. E2013-01409-CCA-R3-CD, 2014 WL 1232204, at *5 (Tenn. Crim. App. Mar. 25, 2014), *perm. app. denied* (Tenn. Aug. 26, 2014). In providing that the trial court will order a new preliminary hearing "upon motion of the defendant," Rule 5.1(a)(3) makes "it clear that a preliminary hearing is not required but rather will be granted only upon request of the defendant." *Id.*

-23-

Pursuant to Rule 5.1(a)(3), the Defendant was required to file a motion seeking a new preliminary hearing within sixty days of his arraignment for the rape charge on August 1, 2011. The Defendant did not file a motion until more than three years after his arraignment. Therefore, the Defendant's motion was untimely, and he is not entitled to relief.

The Defendant maintains that the sixty-day time period began again once he was arraigned on the superseding indictment. The superseding indictment, charging the Defendant with three counts of rape, was returned on May 14, 2015. The Defendant was arraigned on the superseding indictment on May 18. The Defendant, however, did not renew his motion for a new preliminary hearing prior to trial. Rather, prior to the beginning of trial on May 18, defense counsel stated that the Defendant waived any time constraints, agreed to proceed under the new indictment, and was prepared to proceed with the trial. Accordingly, the Defendant is not entitled to relief with regard to this issue.

## III. SUFFICIENCY

The Defendant contends that the evidence is insufficient to support his two convictions for rape. When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a

conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As it relates to this case, rape is defined as "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" where "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent" or "[t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless." T.C.A. § 39-13-503(a)(2), (3). The term "sexual penetration" means "sexual intercourse … or any other intrusion, however slight, of any part of a person's body … into the genital or anal openings of the victim's … body." *Id.* § 39-13-501(7). A "physically helpless" person is "unconscious, asleep or for any other reason physically or verbally unable to communicate unwillingness to do an act." *Id.* § 39-13-501(5).

The Defendant does not challenge whether the State proved the elements of the offenses, but only challenges the sufficiency of the evidence regarding his identity as the perpetrator. The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The issue of identity is a question of fact left to the jury as the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

The Defendant asserts that absent his statement to the police, the evidence is insufficient to establish his identity as the perpetrator. We have held that the Defendant's statement, in which he maintained that he and the victim engaged in consensual sexual intercourse, was properly admitted at trial.

Additional evidence establishing the Defendant as the perpetrator also was presented at trial. At trial, the defense did not contest that the Defendant and the victim engaged in sexual intercourse. Rather, the defense was that the sexual intercourse was consensual. The victim identified her rapist as having hair on his face and stomach. The Defendant was the only man in the house who had facial hair similar to that described by the victim and stomach hair. The Defendant arranged for Ms. Banks and Mr. McGowan to leave the home so that he would be alone with the unconscious victim while his brother slept in another room. The lights were on and the door was unlocked when Ms. Banks and Mr. McGowan left the victim sleeping and the Defendant awake in the room, but the lights were off and the door was locked when they returned. When they entered the apartment, Ms. Banks and Mr. McGowan found the victim distraught. The Defendant also was the only person who was awake inside the house when the rape occurred. He was found in his bed, naked and under the sheets, shortly after the rape occurred, and his

girlfriend discovered that one of the condoms that she had left in the Defendant's bedroom was missing. The discarded condom wrapper was found by police at the head of a bed. This evidence, along with the Defendant's statement admitting that he engaged in sexual intercourse with the victim, was sufficient to establish the Defendant as the perpetrator.

The evidence presented at trial established that the Defendant engaged in sexual intercourse with the victim while she was intoxicated and sleeping and without her consent. This evidence is sufficient to support the Defendant's two rape convictions.

## IV. LIMITATION OF CROSS-EXAMINATION

The Defendant argues that the trial court erred in refusing to allow defense counsel to question the victim about whether she and Mr. McGowan had ever argued about other women. The Defendant also argues that the trial court erred in refusing to allow defense counsel to question Mr. McGowan regarding his relationships with women other than the victim. The State responds that the trial court did not abuse its discretion regarding its evidentiary rulings. We agree with the State.

This court reviews a trial court's rulings on evidentiary matter for an abuse of discretion. *See, e.g., State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.* (citation omitted).

The Defendant maintains that the excluded evidence was relevant pursuant to Tennessee Rule of Evidence 401, which provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Nevertheless, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

### A. Cross-Examination of the Victim

In response to questioning on cross-examination, the victim denied that she ever suspected Mr. McGowan of being unfaithful. Defense counsel asked the victim whether she and Mr. McGowan had ever fought about other women. The victim said that while

she and Mr. McGowan had engaged in fights, she denied that they had ever fought over other women.

During a bench conference, defense counsel argued that the victim had opened the door to questioning regarding a fight between the victim and Mr. McGowan that occurred on February 25, 2009, because Mr. McGowan was using a cellular phone to contact other women and the victim was paying the telephone bill. Defense counsel argued that the evidence was relevant to the defense theory that the victim initiated sexual intercourse with the Defendant in order to retaliate against Mr. McGowan for seeing other women. Defense counsel further argued that the evidence would impeach the victim's testimony that she and Mr. McGowan never fought over his relationships with other women.

During a hearing outside the presence of the jury, the victim testified that while she and Mr. McGowan engaged in an altercation regarding a cellular telephone, she denied that the altercation was over Mr. McGowan's relationship with other women. The victim explained that Mr. McGowan had purchased a cellular phone for her, that he had demanded that she return the telephone after he became mad at her, and that she refused. The victim denied that the altercation was physical. She also denied that she told police officers that she removed Mr. McGowan's name from the cellular phone contract because she believed that he was using the cellular phone to contact other women.

The trial court found that the evidence was not relevant based on the victim's testimony about the incident. The trial court allowed defense counsel to question the victim further during the jury-out hearing about other incidents that had occurred between the victim and Mr. McGowan.

In response to questioning by defense counsel, the victim denied that Mr. McGowan was ever angry at her because he was suspicious about her engaging in relationships with other men. The victim explained that while Mr. McGowan had talked about it, he had never been upset to the point that he became physical with her. She acknowledged that she had called the police on Mr. McGowan "a couple of times," but she denied that Mr. McGowan ever struck her. She said she called the police in order to prevent a fight. With regard to the altercation over the cellular phone, the victim stated that she called the police so that the officers would tell Mr. McGowan to return her cellular telephone to her. She denied telling the police officers that Mr. McGowan had engaged in violence toward her.

The victim acknowledged that she called the police in May 2010 and reported that Mr. McGowan had sprayed her in the face with a water hose during an argument. She denied that Mr. McGowan had punched her during the altercation. The victim did not recall calling the police on June 21, 2012, and reporting that Mr. McGowan chased her

outside and struck her legs and arms with a stick. The victim denied calling the police on Mr. McGowan because he became angry when the father of her first child contacted her. She did not recall calling the police and reporting that Mr. McGowan scratched her face and stomped her feet. The victim testified that she had called the police on Mr. McGowan on several occasions but that she could not recall the exact dates. She said she never saw the police reports generated as a result of her calls.

The victim was unaware of whether Mr. McGowan called the police on June 24, 2008, and reported that she had been calling and arguing with him and that she attempted to run him over with a car. The victim did not consider them broken up on that date because after they argued, they got back together a few hours later. She did not recall Mr. McGowan kicking her out of their home on August 4, 2014. Defense counsel also questioned the victim regarding three domestic violence charges that she received and that were dismissed while the Defendant's rape case was pending. Mr. McGowan was the victim in one of the charges.

Defense counsel argued that the victim opened the door to evidence of her and Mr. McGowan's breakups by denying that they had ever broken up. The trial court noted that the victim denied that she and Mr. McGowan argued over allegations that Mr. McGowan was involved with other women. The trial court found that while the victim and Mr. McGowan had a tumultuous relationship, such evidence was not relevant to the issues raised in the case and was not proper impeachment. Defense counsel argued that the fact that the victim called the police on Mr. McGowan on several occasions while denying that any violence occurred established that the victim likely "must just call the police very lightly" and "might call the police on … [the Defendant] for very little reason." The trial court found such evidence to be speculative.

On appeal, the Defendant argues that evidence of the tumultuous relationship between the victim and Mr. McGowan was relevant to the defense theory that "the victim either made up the story about the [D]efendant, her boyfriend's cousin, raping her in order to retaliate against her boyfriend for seeing other women, or made up the story because she had consensual sex with the defendant." The victim, however, denied that she ever fought with Mr. McGowan about other women or that he became violent with her over suspicions that she was seeing other men. Evidence of disputes that occurred years before or after the offense and that did not involve suspicions of infidelity were not relevant to the issue of whether the victim fabricated the rape allegation. *See* Tenn. R. Evid. 401. The trial court did not abuse its discretion in excluding the evidence.

## B. Cross-Examination of Mr. McGowan

-28-

On cross-examination, Mr. McGowan testified that he and the victim had broken up at times during the course of their relationship. Defense counsel then asked Mr. McGowan whether he was in an exclusive relationship with the victim "at the time." The State objected based on relevance, and defense counsel argued that the evidence was relevant to the defense theory that the victim fabricated her account of the rape due to jealously prompted by Mr. McGowan's long history of infidelity.

During a jury-out hearing, defense counsel asked Mr. McGowan whether the victim had called the police on February 25, 2009, and reported that he struck her face after she tried to remove his name from her cellular telephone contract because she believed he was using his cellular phone to contact other women. Mr. McGowan testified that he did not recall the exact details of the situation. He later testified that they had broken up at times during their five-year relationship prior to the rape. He said that if they were "talking" to other people during the times that they were not together, they were not cheating on each other. Mr. McGowan stated that prior to 2010, he was involved with one other woman, but he was unsure when the relationship occurred.

The trial court allowed defense counsel to question Mr. McGowan about whether he and the victim had broken up during the course of their five-year relationship prior to the rape. The trial court found that there was no evidence that the victim and Mr. McGowan had any issues between them involving other women and that the defense was attempting to present the testimony for purposes of speculation.

On appeal, the Defendant argues that the evidence of Mr. McGowan's relationships with other women was relevant to the defense theory that the victim fabricated the rape due to jealous based upon Mr. McGowan's history of infidelity. However, no evidence was presented establishing that Mr. McGowan had a history of infidelity and that he and the victim had issues in their relationship as a result. Rather, the evidence presented at the jury-out hearing only established that Mr. McGowan had a relationship with another woman sometime during the five years prior to the rape and while he and the victim were broken up. The trial court found that there was no evidence that the victim and Mr. McGowan had disputes about his relationships with other women, and that absent such evidence, the history of their relationship was not relevant to the issues at trial. Such evidence was not relevant to the issues presented at the trial. *See* Tenn. R. Evid. 401, 403. The trial court did not abuse its discretion in excluding the evidence.

## V. VICTIM IMPACT EVIDENCE

The Defendant argues that the trial court erred in admitting improper victim impact testimony from the victim about how the rape had affected her. The State

responds that the victim's testimony was relevant to rebut the Defendant's theory that the victim lied about the rape. We agree with the State.

On direct examination, the prosecutor asked the victim whether she was a "different person" after the rape. The Defendant objected. The State argued that the testimony was relevant in light of defense counsel's opening statement in which defense counsel asserted that the victim continued to socialize with the Defendant and his family after the incident as support for defense counsel's claim that the victim lied about being raped. The trial court allowed the State to question the victim.

The victim then testified that her attitude and personality have changed since the rape. She explained that she did not trust anyone, was unable to sleep at anyone else's home, and did not socialize with anyone.

On redirect examination, the prosecutor asked the victim whether "it has been hard on you to go through these five years" since the rape. Defense counsel objected and argued that such testimony would be improper victim impact evidence. The State responded that the testimony was relevant to counter the Defendant's claim that the victim lied about the rape. The trial court found that the Defendant raised the issue of the victim's motive and that any "post ramifications" to the victim's reporting of rape would be relevant to the issue of motive.

The victim then testified that she had a close relationship with the family of Mr. McGowan and the Defendant prior to the rape. She said that since reporting the rape, her relationship with their family has been strained. She acknowledged that as a result, it would be easy to drop the charges but that she instead chose to tell the truth.

During opening statements, defense counsel acknowledged that the Defendant had consensual sexual intercourse with the victim and maintained that the victim lied about the rape. Defense counsel raised an issue regarding the victim's motive for accusing the Defendant of rape and stated that the victim and Mr. McGowan "lived next-door to Prentis for a while after this happened." The trial court correctly found that the effect of the rape on the victim was relevant in light of the Defendant's challenges to the victim's motive for claiming rape and the Defendant's claim that the victim continued to associate with the Defendant following the rape. *See* Tenn. R. Evid. 401. Moreover, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 402. We conclude that the trial court did not abuse its discretion in admitting the evidence.

# VI. REBUTTAL TESTIMONY

The Defendant contends that the trial court erred in allowing the State to present the rebuttal testimony of the victim and Mr. McGowan in violation of Tennessee Rule of Evidence 615. The State responds that the trial court did not abuse its discretion in allowing the victim and Mr. McGowan to testify in rebuttal and that any error was harmless. We agree with the State.

Following the State's direct examination of Mr. McGowan on the second day of trial, the parties approached the bench and began a discussion about Mr. Lee, who had been subpoenaed by the Defendant to appear at trial. The prosecutor informed the trial court that the State originally subpoenaed Mr. Lee to appear at a proceeding approximately one year prior to the trial but that Mr. Lee failed to appear. The prosecutor stated that the State attempted to subpoena and issued a material witness warrant and that Mr. Lee was eventually arrested and then released. The prosecutor also stated that since Mr. Lee's release, the State's attempts to locate, interview, and serve Mr. Lee with a subpoena for the trial had been unsuccessful. The trial court agreed to order Mr. Lee not to leave before speaking with the State's investigator. The parties then completed their examination of Mr. McGowan at trial.

After Officer Walker, a crime scene officer, and Ms. Vincent testified the following day, the parties approached the bench, and the prosecutor informed the trial court that the State's investigator spoke to Mr. Lee during the prior evening and that based on the interview, the State could not ethically call Mr. Lee as a witness at trial. The prosecutor said Mr. Lee provided information about which the prosecutor was previously unaware. The prosecutor stated that Tennessee Rule of Evidence 615 had been invoked and that the victim and Mr. McGowan had remained in the courtroom after they testified. The prosecutor also stated that based upon the information provided to them by Mr. Lee, she anticipated that the State would need to call the victim and Mr. McGowan as rebuttal witnesses. The prosecutor requested that she be allowed to call the victim and Mr. McGowan as rebuttal witnesses and that the victim be allowed to remain inside the courtroom for the remainder of the trial due to her status as the victim.

The trial court allowed the State to call the victim and Mr. McGowan as rebuttal witnesses. The trial court found that Mr. Lee had not been cooperative with the State, had been avoiding service by the State, and had a warrant for his arrest pending for almost one year. The trial court found no fault with the State based upon Mr. Lee's actions. The trial court required Mr. McGowan to remain outside of the courtroom for the remainder of the trial. However, the trial court found that the victim had a constitutional right to be present at trial and allowed her to remain in the courtroom for the remainder of the trial.

Both the victim and Mr. McGowan testified in rebuttal regarding Mr. Lee's testimony that prior to the incident, the victim told Mr. Lee, the Defendant, Ashley Campbell, and Mr. McGowan that she had a friend who falsely accused a person of rape and received $10,000 from the victim's compensation fund. The victim denied ever making the statement, and Mr. McGowan denied ever hearing the victim make the statement.

Tennessee Rule of Evidence 615 provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

Rule 615 "codifies the long-established practice of sequestering witnesses during a trial so that they may not hear one another testify prior to testifying themselves." *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010).

The trial court has "wide discretion in determining whether to impose the sanction of excluding the evidence of the witness suspected of having violated the rule." *State v. Anthony*, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992) (citing *State v. Moffett*, 729 S.W.2d 679, 681 (Tenn. Crim. App. 1986)); *see Jordan*, 325 S.W.3d at 42. Less severe sanctions include "allowing the offender to testify but subjecting her to cross-examination about her violation, the testimony she heard, and the impact it may have had on her testimony." *Jordan*, 325 S.W.3d at 42 (citing *Anthony*, 836 S.W.2d at 605. The jury also may "'be instructed to consider the violation of the sequestration order in assessing [the credibility of] the witnesses' testimony.'" *Id.* (quoting *Anthony*, 836 S.W.2d at 605).

In order to present the victim and Mr. McGowan as rebuttal witnesses after they remained in the courtroom and heard testimony from other witnesses, the State was required to establish both "genuine surprise and demonstrable need." Tenn. R. Evid. 615

-32-

Advisory Comm'n Cmts. to 1997 Amend. The appellate record includes an extensive discussion between the parties and the State regarding the State's failed efforts to interview and subpoena Mr. Lee. While evidence presented at trial established that Mr. Lee had been interviewed previously by the prosecutor and the State's investigator, Mr. Lee stopped cooperating with the State and did not attend a court setting the prior year in response to a subpoena issued by the State. The State's efforts for approximately one year prior to trial to locate Mr. Lee, interview him, and serve him with a subpoena were unsuccessful. The State's first opportunity to interview Mr. Lee since he had stopped cooperating was not until after the victim and Mr. McGowan had testified. During the interview, Mr. Lee provided information that he had not previously disclosed to the State. Based upon these circumstances, we conclude that the State established "genuine surprise."

While the State did not describe the newly discovered information to the trial court during the jury-out hearing, the State's cross-examination of Mr. Lee and Mr. Merritt's testimony at trial established that the newly discovered information was Mr. Lee's claim that shortly before the incident, the victim had told him, Mr. McGowan, the Defendant, and Ms. Campbell that she knew a woman who falsely accused someone of rape and received $10,000 from the victim's compensation fund. We conclude that the State demonstrated a need to recall the victim and Mr. McGowan to rebut Mr. Lee's claim.

The trial court required that Mr. McGowan remain outside the courtroom for the remainder of the trial. As a result, Mr. McGowan was not present when Mr. Lee testified. The trial court, however, found that the victim had a constitutional right to be present throughout the trial and allowed the victim to stay in the courtroom for the remainder of the trial. *See* Tenn. Const. art. I, § 35, item 3 (providing crime victims with the right "to be present at all proceedings where the defendant has the right to be present"). The determination of whether article I, section 35 of the Tennessee Constitution supersedes the rule of sequestration as it relates to the victims of crime is unsettled. *See State v. Elkins*, 83 S.W.3d 706, 713 (Tenn. 2002) (declining to address the issue).

Even if the trial court erred, however, any error is harmless. *See id.* (concluding that "violations of 'the Rule' are subject to harmless error analysis"). Because Mr. McGowan was not present in the courtroom when Mr. Lee testified, there was no risk that Mr. McGowan tailored his testimony in rebuttal based upon Mr. Lee's testimony, and the purposes of Rule 615 were not thwarted. When the victim testified in rebuttal, defense counsel questioned her on cross-examination regarding the fact that she remained in the courtroom throughout the trial and heard Mr. Lee's allegations, and the victim denied tailoring her testimony based upon Mr. Lee's testimony. Moreover, evidence was presented throughout the trial regarding the sources from which the victim obtained

information of the victim's compensation fund after she reported the rape. When the victim testified during the State's case-in-chief, she denied on cross-examination that she was aware of the victim's compensation fund before April 2010, that she spoke to Mr. Lee about the fund, or that she had spoken about a friend who received $10,000 for claiming that she was raped. The victim also testified that she first learned about the existence of the victim's compensation fund at the Memphis Sexual Assault Resource Center. The victim did not seek compensation soon after reporting the rape but waited approximately nine months after the rape to file an application. The medical examination that the victim underwent cost $750. The evidence established that the victim could have declined to pursue the charges against the Defendant once she received the money but, instead, chose to continue pursuing the charges for several years after receiving compensation. In light of the victim's testimony during the State's case-in-chief, Mr. McGowan's absence from the courtroom during Mr. Lee's testimony, and other evidence presented at trial countering the Defendant's theory that the victim falsely accused him of rape in order to receive funds from the victim's compensation fund, any error by the trial court is harmless.

## VII. LESSER-INCLUDED OFFENSES

The Defendant asserts that the trial court erred in failing to instruct the jury on assault as a lesser-included offense of rape. Defense counsel filed a motion requesting that the trial court instruct the jury on "Assault-Bodily Harm" and "Assault-Offensive Contact" as lesser-included offenses of rape. At trial, the trial court analyzed the offenses of assault by causing bodily injury, assault by causing another to reasonably fear imminent bodily injury, and assault through extremely offensive or provocative contact. *See* T.C.A. § 39-13-101(a) (Supp. 2009). The trial court concluded that the offenses were not lesser-included offenses of rape.

In *State v. Burns*, the Tennessee Supreme Court adopted the following definition of a lesser-included offense:

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or

-34-

> (2) a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c) it consists of
>
>> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

*State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999). An offense is also a lesser-included offense if expressly designated by the General Assembly. *State v. Howard*, No. E2014-01510-SC-R11-CD, __ S.W.3d __, 2016 WL 5933430, at *4 (Tenn. 2016) (citations omitted).

In 2009, Tennessee Code Annotated section 40-18-110 was amended to define lesser-included offenses in pertinent part as follows:

> (f) An offense is a lesser included offense if:
>
> (1) All of its statutory elements are included within the statutory elements of the offense charged;
>
> (2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);
>
> (3) The offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or
>
> (4) The offense is solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

….

> (g)(4)  Sexual battery and sexual battery by an authority figures are lesser included offenses of rape and aggravated rape.

T.C.A. § 40-18-110(f), (g)(4) (Supp. 2009).  The Tennessee Supreme Court recently held in defining lesser-included offenses in section 40-18-110, the General Assembly did not abrogate part (b) of *Burns*.  *Howard*, __ S.W.3d at __, 2016 WL 5933430, at *9.  Thus, in addition to the definitions of lesser-included offenses in section 40-18-110(f), an offense is a lesser-included offense if

> the elements of the lesser-included offense [are] included in the elements of the charged offense, except to the extent that the lesser-included offense "contains a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability; and/or (2) a less serious risk of harm to the person, property or public interest."

*Id.* at *10 (quoting *Burns*, 6 S.W.3d at 466-67).

The trial court must instruct the jury on a lesser-included offense if the trial court concludes that "any evidence as to a lesser-included offense exists that reasonable minds could accept *and* that the evidence, viewed liberally in the light most favorable to the lesser-included offense, is legally sufficient to support a conviction."  *Id.* at *4 (citing *Burns*, 6 S.W.3d at 469) (emphasis in original).  The issue of whether the trial court properly instructed the jury regarding lesser-included offenses is a mixed question of law and fact, which this court reviews de novo with no presumption of correctness.  *Id.* at *3.

This court has recognized that assault through extremely offensive or provocative contact is a lesser-included offense of rape by force or coercion.  *See State v. David Gene Hooper*, No. E2004-01053-CCA-R3-CD, 2005 WL 1981789, at *13 (Tenn. Crim. App. Aug. 16, 2005); *see also State v. Michael Elvis Green*, No. W2001-00455-CCA-R3-CD, 2002 WL 1482680, at *6 (Tenn. Crim. App. Mar. 8, 2002) (stating that "it is arguable that Class B misdemeanor assault is a lesser-included offense of rape" under part (b) of *Burns*).  While the Defendant was not convicted of rape by force or coercion, this court also has recognized that assault through extremely offensive or provocative contact is a lesser-included offense of rape without consent.  *See State v. Haskel D. Finch*, No. M2001-00340-CCA-R3-CD, 2002 WL 1204931, at *14-15 (Tenn. Crim. App. June 5, 2002).

Even if the trial court erred in not charging the jury with any of the assault offenses as lesser-included offenses of rape without consent and rape of a mentally

defective, mentally incapacitated, or physically helpless victim, we conclude that any error is harmless beyond a reasonable doubt. An error in failing to instruct the jury on a lesser-included offense is harmless beyond a reasonable doubt if "the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses." *State v. Allen*, 69 S.W.3d 181, 189 (Tenn. 2002) (citing *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998)). The trial court instructed the jury at trial on attempted rape, sexual battery, and attempted sexual battery as lesser-included offenses of the rape charges. Sexual battery is a Class E felony, while assault is either a Class A or a Class B misdemeanor. *See* T.C.A. §§ 39-13-101(b)(1) (Supp. 2009); 39-13-505(c). By finding the Defendant guilty on the greater offense of rape to the exclusion of the lesser-included offense of sexual battery, which is a higher grade of offense than assault, the jury necessarily rejected all other lesser-included offenses, including assault. Accordingly, any error is harmless beyond a reasonable doubt.

## VII.  SENTENCING

The Defendant challenges his sentences as excessive. Specifically, he argues that the trial court misapplied as an enhancement factor that the victim was "particularly vulnerable because of age or physical or mental disability." T.C.A. § 40-35-114(4). The State responds that the trial court did not abuse its discretion in sentencing the Defendant. We agree with the State.

### A.  Sentencing Hearing

During the sentencing hearing, the State entered the Defendant's presentence report and his juvenile court history packet as exhibits. According to the Defendant's presentence report, he had prior convictions for driving on a suspended license, evading arrest, theft of property valued more than $500, and reckless endangerment.

The Defendant presented the testimony of Ms. Amanda Garey, Mr. Willie Garey, Ms. Valerie Lee, Ms. Ranisha Parker, and Ms. Marshika Redmond. Ms. Garey, the Defendant's older sister, testified that she and the Defendant were close throughout their childhood. She said the Defendant did not get into trouble when he was younger and did well in school. She described their family as close-knit and stated that the Defendant has maintained a relationship with his four children. Ms. Garey stated that while the Defendant had difficulty finding employment while the charges were pending, he made every effort to provide for his children, including cutting grass and working with his father. The Defendant also assisted his aunt, who has kidney disease, by driving her to doctor appointments and performing chores at her home.

Ms. Garey expressed her belief that the Defendant did not deserve a twelve-year sentence and maintained that the Defendant was not a threat to society. She said that when she learned that the Defendant was charged with rape, she "couldn't believe it."

Mr. Garey, the Defendant's father, testified that the Defendant had been assisting him in painting and performing yard work and "concrete work." The Defendant also had been living with him. Mr. Garey said he believed that the Defendant was going to prison "for nothing" and that the Defendant was innocent of the offense. Mr. Garey said the Defendant was not a threat to anyone.

Ms. Lee testified that she and the Defendant grew up in the same household and that they have maintained a close relationship. Ms. Lee said she believed that the Defendant was innocent of the offense and that his imprisonment would not benefit him or society.

Ms. Parker, the Defendant's cousin, testified that they grew up together and maintained a close relationship. She described the Defendant as a "good person" and said he was not a violent person. She believed that the Defendant did not commit the offense and should receive the minimum sentence.

Ms. Redmond, the Defendant's "cousin in law," testified that she had known the Defendant for five or six years and that he had assisted her in caring for her children. She said the Defendant was not a violent or dangerous person. She did not believe that the Defendant committed the offense or that he received a fair trial. She believed that the Defendant's children would suffer if he was sent to prison for a long period of time.

In imposing a sentence, the trial court considered the sentencing factors in Tennessee Code Annotated sections 40-35-102 and 40-35-103, the presentence report, the testimony of the witnesses, and the arguments of the parties. The trial court merged the conviction for rape of an incapacitated person into the conviction of rape without consent, noting that they were alternative theories of the same offense.

The trial court found as an enhancement factor that the Defendant had "a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." *See* T.C.A. § 40-35-114(1). The trial court also applied as an enhancement factor that, as a juvenile, the Defendant was adjudicated to have committed a delinquent act that would have constituted a felony if committed by an adult. *See id.* § 40-35-114(16). The trial court gave the enhancement factor no weight, noting that the juvenile offense occurred approximately twenty years ago and that the court already had applied the prior criminal history enhancement factor. The trial court stated that it was "somewhat inclined, although somewhat reluctant" to consider as an

enhancement factor that the Defendant abused a position of private trust. *See id.* § 40-35-114(14). The court noted that the victim was the girlfriend of the Defendant's cousin, had been living temporarily at the Defendant's home, and should have been able to feel safe under the circumstances. The trial court did not place "a great deal of emphasis" on the enhancement factor but believed the factor was "worth noting in passing."

The trial court applied as mitigating factors (1) that the Defendant's "criminal conduct neither caused nor threatened serious bodily injury"; (2) that the Defendant, "although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct"; and (3) residual doubt. *See id.* § 40-35-113(1), (11), (13). The trial court described the circumstances of the offense as "somewhat unique" and said that based on the Defendant's criminal history and the circumstance of the offense, it could not find that there was likely a sustained intent to violate the law.

The trial court found that confinement was necessary to avoid depreciating the seriousness of the offense. *See id.* § 40-35-103(1)(B). The trial court stated that the Defendant took advantage of the victim while she was in "an extremely vulnerable and intoxicated state." The trial court also stated that even if it accepted the Defendant's claim that the victim "enticed him into having sex" while in a "drunken stupor," the Defendant acted in a reckless manner and took advantage of the victim. The trial court also found that confinement was necessary to deter others likely to commit similar offenses. *See id.* The trial court then sentenced the Defendant to ten years to be served in confinement at 100 percent.

## B. Analysis

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court is "to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. A sentence imposed by the trial court that

is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id*. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id*. § 40-35-103(4), (5).

The Defendant maintains that the trial court erred in applying as an enhancement factor that the victim was "particularly vulnerable because of age or physical or mental disability." *Id*. § 40-35-114(4). The trial court, however, did not apply the victim's vulnerability as an enhancement factor. Rather, the trial court discussed the victim's vulnerability in finding that confinement was necessary to avoid depreciating the seriousness of the offense and to deter others likely to commit similar offenses. *See id.* § 40-35-103(1)(B).

The record reflects that the trial court considered the purposes and principles of the Sentencing Act when sentencing the Defendant to a within-range sentence for a Range I offender. The record also supports the findings of the trial court regarding the enhancement factors. As a result, we conclude that the trial court did not abuse its discretion in sentencing the Defendant, and he is not entitled to relief regarding this issue.

### VIII. CUMULATIVE ERROR

The Defendant asserts that he is entitled to a new trial based upon cumulative error. The doctrine of cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Reversal for cumulative error functions to protect the defendant's constitutional right to a fair trial, but such reversals are rare. *State*

*v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). The doctrine of cumulative error only applies when there has been more than one error committed during trial. *Hester*, 324 S.W.3d at 77. The appellate court must assess whether the errors, each of which may be harmless in isolation, function in the aggregate to deny the defendant the right to a fair trial. *Id*. at 76. Such claims are *sui generis* and must be assessed against the background of the whole case, evaluating the nature and number of errors, their relationship with one another and combined effect, the trial court's remedial efforts, the strength of the State's case, and the length of the proceedings. *Herron*, 461 S.W.3d at 910 (citing *Hester*, 324 S.W.3d at 77). We conclude that the aggregate of any errors committed during trial were not such as to deny the Defendant his right to a fair trial, and we accordingly deny relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court.


_____
JOHN EVERETT WILLIAMS, JUDGE


-41-